**THE SHAPIRO FIRM, LLP**
Robert J. Shapiro
Jonathan S. Shapiro
270 Madison Avenue, Suite 1801
New York, NY 10016
Email: rshapiro@theshapirofirm.com
        jshapiro@theshapirofirm.com
Tel. (212) 391-6464
Fax. (212) 719-1616

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Email: mhynes@hh-lawfirm.com
        lhernandez@hh-lawfirm.com
Tel. (484) 875-3116
Fax. (914) 752-3041

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC MANLEY, Derivatively on Behalf of LATCH, INC. F/K/A TS INNOVATION ACQUISITIONS CORP., <br><br> Plaintiff, <br><br> v. <br><br> LUKE SCHOENFELDER, GARTH MITCHELL, BARRY SCHAEFFER, RAJU RISHI, J. ALLEN SMITH, PETER CAMPBELL, PATRICIA HAN, ROBERT SPEYER, and ANDREW SUGRUE <br> Defendants, <br><br> -and- <br><br> LATCH, INC. F/K/A TS INNOVATION ACQUISITIONS CORP., <br><br> Nominal Defendant. | Civil Action No.: <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Eric Manley ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Latch, Inc. ("Latch" or the "Company") f/k/a TS Innovation Acquisitions Corp. ("TSIA") against the Individual Defendants (as defined below) seeking to remedy their breaches of fiduciary duties and other violations of law from June 9, 2021 through August 25, 2022 (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by Latch with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Latch; (c) review of news articles, stockholder communications, and postings on Latch's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from  a securities fraud class actions pending in this Court  captioned, *Brennan v. Latch Inc., et al.,* Case No. 1:22cv7473 and a securities fraud class action captioned *Schwartz v. Latch, Inc. et al,* Case no. 1:23-cv-00027-UNA pending in the United States District Court District of Delaware (together the "Securities Class Actions") ; and (e) review of other publicly available information concerning Latch and the Individual Defendants.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a shareholder derivative action asserting claims for breach of fiduciary duty and other violations of law against certain officers and members of the Company's Board of Directors (the "Board").

2.      Latch operates as an enterprise technology company in the United States and Canada. The company offers LatchOS, an operating system that extends smart access, delivery

and guest management, smart home and sensors, connectivity, and personalization and services.

3.      On or about June 3, 2021, Latch became a public entity via a business combination with TSIA (the "Business Combination"). TSIA, was already a publicly traded special purpose acquisition company launched by leading real estate owner, developer, operator, and investment manager Tishman Speyer Properties, L.P. ("Tishman Speyer").

4.      "Latch's long-term mission is to make all types of spaces better places to live, work, and visit," said Luke Schoenfelder ("Schoenfelder"), at the time, Latch's Co-Founder, CEO, and Chairman of the Board regarding the Business Combination. "As a public company, we expect to have the capital and strategic resources to deliver new products, grow our market share in North America, enter new markets abroad, and expand into new verticals that will benefit from our unique, full-building operating system. We look forward to executing our strategic objectives and driving enhanced value for our shareholders, customers, and residents."

5.      Similarly, defendant Robert Speyer ("Speyer"), President and CEO of Tishman Speyer and member of the Board of Directors of Latch, said, "We were attracted to Latch for its proven business model, strong leadership, and exceptional products, which have completely changed the building experience. I look forward to continuing my collaboration with Luke and the management team, helping Latch strengthen and grow its position in the industry."

6.      However, on August 10, 2022, Latch filed a Form 12b-25 Notification of Late Filing with the SEC, noting that the Board and the Audit Committee had commenced an investigation that included, but may not be limited to, "certain aspects of the Company's current and historic key performance indicators and revenue recognition practices, including the accounting treatment, financial reporting and internal controls related thereto." As a result, Latch announced it would not be filing its timely quarterly report.

7.     On August 25, 2022, after the market closed, Latch revealed that it would restate financial statements for 2021 and the first quarter of 2022 due to revenue recognition errors related to the sale of hardware devices. Specifically, the Company stated that "certain revenue recognition errors occurred as a result of unreported sales arrangements due to sales activity that was inconsistent with the Company's internal controls and procedures," *i.e.,* the Individual Defendants were representing that Latch was doing better than it actually was.

8.     On this news, Latch's stock fell $0.13, or 12.2%, to close at $0.95 per share on August 26, 2022, on unusually heavy trading volume.

9.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants materially misrepresented (1) that there were unreported sales arrangements related to hardware devices; (2) that, as a result, the Company had improperly recognized revenue throughout fiscal 2021 and first quarter 2022; (3) that there were material weaknesses in Latch's internal control over financial reporting related to revenue recognition; (4) that, as a result of the foregoing, Latch would restate financial statements for fiscal 2021 and first quarter 2022; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

10.     The Individual Defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by knowingly engaging in the deceptions alleged herein.

11.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Latch has sustained damages as described below.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9).

13.     Venue is proper in this District because the Company's principal place of business is in this District and the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this District and one of the Securities Class Actions is pending in this District.

## PARTIES

14.     Plaintiff is a stockholder of Latch, was a stockholder of Latch at the time of the wrongdoing alleged herein and has been a stockholder of Latch continuously since that time.

15.     Defendant Latch is incorporated under the laws of Delaware with its principal executive offices located in New York, New York. Latch's common stock trades on the NASDAQ exchange under the symbol "LTCH."

16.     Defendant Schoenfelder co-founded Latch in 2014 and served as Latch's Chief Executive Officer ("CEO") and Chairman of the Board until January 2023. Schoenfelder is named as a defendant in the Securities Class Action.

17.     Defendant Garth Mitchell ("Mitchell") was Latch's Chief Financial Officer ("CFO") since prior to the Business Combination until May 10, 2022. Mitchell is named as a defendant in the Securities Class Action.

18.     Defendant Barry Schaeffer ("Schaeffer") served as the Interim CFO from May 10, 2022 until January 2023. Schaeffer joined Latch as Senior Vice President, Finance in August 2021. Schaeffer is named as a defendant in the Securities Class Action.

19.     Defendant Raju Rishi ("Rishi") has served as a member of the Board since the Business Combination. Rishi is named as a defendant in the Securities Class Action.

20.     Defendant J. Allen Smith ("Smith") has served as a member of the Board since the Business Combination. Smith is named as a defendant in the Securities Class Action.

21.     Defendant Peter Campbell ("Campbell") has served as a member of the Board since the Business Combination. Campbell is named as a defendant in the Securities Class Action.

22.     Defendant Patricia Han ("Han") has served as a member of the Board since the Business Combination. Han is named as a defendant in the Securities Class Action.

23.     Defendant Robert Speyer ("Speyer") has served as a member of the Board since the Business Combination. Speyer is the President and CEO of Tishman Speyer. Speyer is named as a defendant in the Securities Class Action.

24.     Defendant Andrew Sugrue ("Sugrue") has served as a member of the Board since the Business Combination. Sugrue is named as a defendant in the Securities Class Action.

25.     Collectively, Defendants Schoenfelder, Mitchell, Schaeffer, Rishi, Smith, Campbell, Han, Speyer, and Sugrue are referred to herein as the "Individual Defendants."

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

26.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Latch and its stockholders' fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Latch in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Latch and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

27.     Each Individual Defendant owed and continues to owe Latch, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Latch, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Latch, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, finances, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

29.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

a)  ensure that the Company complied with its legal obligations and requirements— including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

b)  conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

c) remain informed as to how Latch conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

d) truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

30.    Additionally, the Company's Code of Business Conduct and Ethics (the "Code"), which applies to all directors, officers, and employees of Latch , provides that all directors, officers, and employees must be knowledgeable of and conduct business in accordance with all applicable laws, rules, and regulations. Specifically, the Code states:

> This Code of Business Conduct and Ethics (this "Code") contains general guidelines for how we work at Latch, Inc. (the "Company" or "we") consistent with the highest standards of business ethics. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, the Company adheres to these higher standards.

31.    The Code goes on to state:

COMPANY RECORDS

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology and product development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business. All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. Please contact your supervisor or the head of the Company's Legal Department to obtain a copy of any such policy or with any questions concerning any such policy.

***

ACCURACY OF FINANCIAL REPORTS AND OTHER PUBLIC COMMUNICATIONS

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability. The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

*** 

COMPLIANCE WITH LAWS AND REGULATIONS

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, testing, approval, manufacture, marketing and sale of our products and product candidates, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the head of the Company's Legal Department.

32.     In addition to these duties, the Board's Audit Committee members during the Relevant Period, Defendants Campbell, Rishi, and Smith (referred to herein as the "Audit Committee Defendants") had enhanced duties and responsibilities.  Per the Audit Committee Charter:

The purpose of the Audit Committee (the "Committee") is to assist the Board of Directors (the "Board") of Latch, Inc. (the "Company") in: (a) its oversight and monitoring of: (i) the integrity of the Company's financial statements and other financial information provided by the Company to its stockholders and others; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's independent auditor; and (v) the design and implementation of the Company's internal audit function and the performance of the internal audit function after it has been established, and (b) preparing the Committee report

required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

33.     Per the Audit Committee Charter, the Audit Committee Defendants also had the

following responsibilities:

Annual Financial Statements and Annual Audit.
1.   Audit Problems. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.
2. Form 10-K Review. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."
3. Audit Committee Report. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

Quarterly Financial Statements. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

Other Duties and Responsibilities.
1. Review of Earnings Releases. The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.
2. Risk Assessment and Risk Management. The Committee must discuss the Company's policies with respect to risk assessment and risk management.

***

Review of Internal Control Over Financial Reporting. The Committee must review and discuss with management, the internal auditor (or other personnel responsible for the internal audit function), once established, and the Company's independent auditor, the adequacy and effectiveness of the Company's internal control over financial reporting ("ICFR"), the adequacy of the Company's disclosures about changes in ICFR and any steps management has taken to address material deficiencies in ICFR. The Committee must review and discuss with management and the Company's independent auditor's management's report on ICFR and the Company's independent auditor's attestation report on the Company's ICFR for purposes of the Company's Annual Report on Form 10-K, to the extent such reports are required.

Reports to the Board of Directors. The Committee must report regularly to the Board regarding the activities of the Committee.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

34.     Latch was founded in 2014 by defendant Schoenfelder. The Company operates as an enterprise technology company in the United States and Canada, and offers LatchOS, an operating system that extends smart access, delivery and guest management, smart home and sensors, connectivity, and personalization and services.

35.     TSIA was a blank check company. A blank check company, known as a special purpose acquisition company, is an early or development stage entity created specifically for the purpose of acquiring or merging with one or more existing businesses.

36.     On or about June 3, 2021, Latch became a public entity via the Business Combination with TSIA. TSIA, was a publicly traded special purpose acquisition company launched by leading real estate owner, developer, operator, and investment manager Tishman Speyer.

37.     In connection with the Business Combination, Latch received approximately $453 million in cash proceeds, net of fees and expenses funded in conjunction with the closing of the Business combination, which included $190 million from a previously announced private placement of common stock.

### THE COMPANY'S FALSE AND/OR MISLEADING REGISTRATION STATEMENT AND PROSPECTUS IN CONNECTION WITH THE BUSINESS COMBINATION

38.     Latch (then named TSIA) filed a Form S-4 Registration Statement and Proxy/Prospectus with the SEC on March 10, 2021, in anticipation of the consummation of the Business Combination. Latch (then named TSIA) later filed amendments to the Registration Statement on March 30, 2021, May 3, 2021, May 10, 2021, and May 12, 2021 (collectively, with the March 10, 2021 statement the "Pre-Merger Registration Statement" or "Registration

Statement"). The Pre-Merger Registration Statement was declared effective on May 12, 2021.

39.     The Pre-Merger Registration Statement contained a number of material misrepresentations and omissions and failed to identify material risks.

40.     These misrepresentations affect nearly every aspect of the "Key Business Metrics" identified in the Pre-Merger Registration Statement.

***Material Misrepresentation of the Bookings based on LOIs***

41.     The Pre-Registration Merger Statement described Latch as "an enterprise technology company focused on revolutionizing the way people experience spaces by making spaces better places to live, work, and visit.

42.     Latch's sales strategy was described as "simple, repeatable, scalable and unique." But TSIA and Latch materially misrepresented Latch's sales revenue and bookings, which were primarily based on non-binding letters of intent ("LOIs"). Although mentioned frequently in the Pre-Merger Registration Statement, many assertions based on the LOIs were false and the LOIs were never mentioned as a risk factor. For example, the Pre-Merger Registration Statement first describes the LOIs in the "Company Overview" section supporting its supposedly "simple" and "scalable" sales strategy:

> Latch engages with customers early in their construction or renovation process, establishing Latch as a technology advisor to the building. This not only enables us to provide more technology advice early in the development process, but it also creates high revenue visibility. Our customers sign letters of intent ("LOIs") specifying which software and devices they want to receive and on which dates. This approach leads to multi-year software contracts, direct feedback loops with our customers and their residents, local and regional market insights, and a full picture of the ever-changing demands of building operators.

> With a delivery timeline that can range from an average of six to eighteen months after signing the LOI, depending on the construction schedule, we continuously evolve our products and add new features between the time of signing of the LOI and the time of install.

43.    In discussing Key Business Metrics, with regard to Bookings, the Pre-Merger Registration Statement states:

> We use Bookings to measure sales volume and velocity of our hardware and software products. Bookings represent written but non-binding LOIs from our customers to purchase Latch hardware products and software services, not reflecting discounts. We sell software services with all our access hardware products. Based on historical experience, we believe there is sufficient or reasonable certainty about the customers' ability and intent to fulfill these commitments with a target delivery date no longer than 24 months following LOI signature.

44.    The Pre-Merger Registration Statement also discusses an even shorter time period for realizing LOIs when discussing the Key Business Metric, "Booked Annual Recurring Revenue", stating:

> We use Booked Annual Recurring Revenue ("ARR") to assess the general health and trajectory of our recurring software. Booked ARR is defined as the cumulative value of annual recurring revenue from Latch software subscriptions that are under a signed LOI. We calculate Booked ARR by multiplying the total number of units that have been booked by the annual listed subscription pricing (excluding discounts) at the time of booking. LOIs typically deliver within 6 to 18 months of signing, depending on construction timelines. Booked ARR is adjusted for bookings that do not ship within a normal construction time-frame. It should be viewed differently from Software Booking as it represents only the average annual software revenue, not the lifetime contract value.

45.    The representations in the Pre-Merger Registration Statement were false.  In reality, a LOI was just an option to lock in a price and quantity at which one could purchase Latch's hardware and software, without an agreement of purchase or payment. Thus, there was no real probability of converting the LOI to actual revenue.

46.    A key issue with converting an LOI to an actual sale was retrofitting, the process by which an older building would be updated to allow for Latch device use. While a client who owned multiple buildings might initially intend to install Latch devices in ten of them, which the LOI would then reflect, older buildings often presented major structural issues that would prevent Latch device installation from being economically feasible. However, the Pre-Merger Registration

Statement stated that Latch expected that retrofit opportunities would continue to increase significantly stating:

> Currently we primarily serve the rental homes markets in North America. Based on internal research and external reporting, we estimate there are approximately 32 million multifamily apartment home units in North America. Today we primarily serve new construction and retrofit buildings. Since our launch in 2017, we have seen the share of our business coming from retrofit opportunities increase significantly: a trend we expect to continue over the medium term. We also serve the single-family rental market through our existing relationships with large real estate developers and owners. Based on internal research and external reporting, we estimate there are 15 million single-family rental home units in North America.

47.     There was no warning in the Pre-Merger Registration Statement about the risk of Latch device installations not being feasible in older buildings.

48.     As stated in the Pre-Merger Registration Statement, the LOIs also did not include sales discounts. But, upon information and belief, the average discount received by customers hovered above 20% in February 2021. Relying on the LOIs without sale discounts as the basis for Latch's sales thus also artificially inflated sales numbers by excluding the reality of discounts.

***Hardware sales were materially inflated by early delivery***

49.     Hardware sales were also misrepresented in the Pre-Registration Statement. Regarding hardware sales, the Pre-Merger Registration statement states, in relevant part:

> We generate hardware revenue primarily from the sale of our portfolio of devices both first-party and third-party for our smart access and smart building solutions. We sell hardware to building developers through our channel partners who act as the intermediary and installer. ***We recognize hardware revenue when the hardware is shipped to our channel partners, which is when control is transferred to the building developer***. The Company provides warranties related to the intended functionality of the products and those warranties typically allow for the return of defective hardware up to one year for electrical components and five years for mechanical components past the date of sale. We are currently in the process of developing and manufacturing our new generation of hardware products with much lower production costs which we expect will improve our future hardware margins.

14

***

> We currently generate revenue primarily from two sources, hardware devices and software products. Revenue is recognized upon transfer of control of promised goods or services to customers at transaction price. The Company estimates the transaction price, including variable consideration, at the commencement of the contract and recognizes revenue over the contract term.

(Emphasis added).

50.    So that it could "recognize revenue" earlier, Latch manipulated hardware sales numbers. Latch would recognize revenue based on shipments of product by quarter. If Latch was not meeting the quotas management desired, employees were instructed to ship products to customers who did not yet need them, for the purpose of recognizing revenue.

***Smart Home technology***

51.    Latch's "Smart Home" integration software is integral to the Company. The purpose of the Smart Home technology was to provide an all-encompassing technology home ecosystem for the customers. The Pre-Merger Registration Statement described this as a factor pertaining to TSIA's board of directors' support for the Business Combination:

> Large and Expanding Growth Industry. Latch primarily serves the rental homes market in North America, which comprises approximately 32 million multifamily apartment home units and 15 million single-family rental home units in North America. Latch is well positioned to take advantage of the growth in the smart home market, as well as to pursue other opportunities in adjacent segments, including expansion into the commercial office segment.

> Attractive Business Model with Recurring Revenue Stream. Latch provides a full-service smart home ecosystem for customers. Its integrated product, which delivers a building software solution delivered through Latch hardware, allows for significant customer retention through long-term contracts, which generate high quality, long-term recurring software revenues.

52.    Latch also stated the following in the Company Overview:

> After Latch has been installed and set up at a building, the building

managers add all their residents as users to the Latch system. Our mobile applications then enable the residents to unlock all connected spaces in Latch buildings from the front door, package rooms, common spaces, elevators, and garages to their unit entrance, control their thermostat and smart home devices from the app, see who rang the bell at the front door through the intercom and let guests in through the app. ***In the near future, we believe interacting with services, buying renters insurance or choosing their internet package will all be possible from the Latch App. Residents become highly engaged users across all the capabilities that Latch provides them in their spaces***.

(Emphasis added).

53.     Latch materially misrepresented the functionality growth opportunity of the Smart Home technology. The Smart Home technology was not operational even though  Latch continued to "book" it in the LOIs. There were also no clients to serve as references for it.

***Booked Home Units—Cumulative***

54.     Upon information and belief, Latch also inflated the numbers it presented for "Booked Home Units—Cumulative." The Pre-Merger Registration statement states:

We use Booked Home Units—Cumulative to measure the number of homes signed to operate on our platform, market penetration in the rental homes market, and the size opportunity to grow revenue from increasing sales of additional hardware, software, and service revenue into signed homes. Booked Home Units represent the total number of apartment units or similar dwellings installed cumulatively, as well as committed to be installed, with Latch products.

55.     Latch materially misrepresented the Booked Home Units. In truth, given the issues with retrofitting and the lack of a proof of concept for the Smart Home technology, the "size opportunity to grow revenue for additional hardware, software, and service revenue" was overstated. The problem was that (1) the units that were counted as growth opportunities in actuality might not be compatible with Latch devices (lack of feasibility of retrofitting); and (2) even if they were generally compatible, many of the devices which Latch forecasted for growth lacked a proof of concept and did not actually exist. In reality, Latch was a business based on a

futuristic concept and not an ongoing business model, as represented by the Individual Defendants.

*International expansion*

56.    Latch materially misrepresented its international brand and its opportunity to grow internationally at a quick pace. The Pre-Merger Registration Statement represented that Latch was close to expanding its international reach:

> Today, we only operate in the United States and Canada. While these geographies present sizable opportunities for Latch, our solution set is well-positioned to enter new geographic markets such as Europe. We see a near-term opportunity to expand into France, Germany, and the United Kingdom with the support of Tishman Speyer and current customers as our anchor partners in these regions.

57.    In reality, Latch's business in Canada was extremely limited, with just one wholesaler partnership. Due to legal reasons, Canadians could not use all of the products, and because the applications were not bilingual (in both English and French) they could not legally be used in certain provinces, including Quebec. The fact that the software was not available in other languages is also the reason that Latch was not in a position to enter Europe, as claimed.

58.    On May 13, 2021, the Company filed its prospectus / proxy statement on Form 424b3 soliciting stockholder approval of the Business Combination. It reported that the following material weaknesses existed in Latch's internal control over financial reporting:

> Latch has identified material weaknesses in its internal control over financial reporting that Latch is currently working to remediate, which relate to: (a) Latch's general segregation of duties, including the review and approval of journal entries; (b) the lack of a formalized risk assessment process; and (c) selection and development of control activities, including over information technology.
> Latch's management has concluded that these material weaknesses in Latch's internal control over financial reporting are due to the fact that Latch is a private company with limited resources and does not have the necessary business processes and related internal controls formally designed and implemented coupled with the appropriate resources with the appropriate level of experience and technical expertise to oversee Latch's business processes and controls.
>
> Latch's management is in the process of developing a remediation plan. The material weaknesses will be considered remediated when Latch's management

designs and implements effective controls that operate for a sufficient period of time and management has concluded, through testing, that these controls are effective. Latch's management will monitor the effectiveness of its remediation plans and will make changes management determines to be appropriate.

If not remediated, these material weaknesses could result in material misstatements to Latch's annual or interim consolidated financial statements that might not be prevented or detected on a timely basis, or in delayed filing of required periodic reports.

59.     This identification of "material weaknesses" did nothing to address the false and misleading statements contained in the Pre-Merger Registration Statement and in fact, made the material weakness sound completely procedural in nature, merely a function of going from a private company to a publicly owned one.

**MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED AFTER THE BUSINESS COMBINATION**

60.     On June 9, 2021,  Latch announced its first quarter 2021 financial results in a press release that stated, in relevant part:

*$ in thousands*

|  | Three months ended March 31, | | | |
|  | 2021 | 2020 | $ Change | % Change |
|---|---|---|---|---|
| Revenue | $6,629 | $2,726 | $3,903 | 143% |
| Cost of revenue (1) | $6,162 | $3,262 | $2,900 | 89% |
| Operating expenses (1) | $31,714 | $15,345 | $16,369 | 107% |
| Other expenses (2) | $6,854 | $60 | $6,794 | NM |
| GAAP net loss | $(38,101) | $(15,941) | $(22,160) | (139%) |

NM: Not meaningful

61.     On August 12, 2021, Latch announced its second quarter 2021 financial results in a press release that stated, in relevant part:

*$ in thousands (unaudited)*

| | Three months ended June 30, | | $ Change | % Change |
|---|---|---|---|---|
| | 2021 | 2020 | | |
| Revenue | $    9,012 | $    2,752 | $    6,260 | 227% |
| Cost of revenue | $    8,242 | $    3,239 | $    5,003 | 154% |
| Operating expenses | $  22,726 | $  14,082 | $    8,644 | 61% |
| Other expenses (1) | $  18,105 | $       417 | $  17,688 | NM |
| GAAP net loss | $ (40,071) | $ (14,986) | $ (25,085) | (167%) |

62.     On August 13, 2021, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2021, affirming the previously reported financial results. It also stated that the Company's "disclosure controls and procedures were not effective" due to the previously disclosed material weaknesses.

63.     On November 9, 2021, Latch announced its third quarter 2021 financial results in a press release that stated, in relevant part:

*$ in thousands (unaudited)*

| | Three months ended September 30, | | $ Change | % Change |
|---|---|---|---|---|
| | 2021 | 2020 | | |
| Revenue | $  11,197 | $    5,095 | $    6,102 | 120% |
| Cost of revenue | $  11,153 | $    5,890 | $    5,263 | 89% |
| Operating expenses | $  34,391 | $  14,657 | $  19,734 | 135% |
| Other income (expense) (1) | $       108 | $      (422) | $       530 | 126% |
| GAAP net loss | $ (34,239) | $ (15,874) | $ (18,365) | (116%) |

64.    On November 10, 2021, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2021, affirming the previously reported financial results. It also stated that the Company's "disclosure controls and procedures were not effective" due to the previously disclosed material weaknesses.

65.    On February 24, 2022, Latch announced its fourth quarter 2021 financial results in a press release that stated, in relevant part:

*$ in thousands (unaudited)*

|  | Three months ended December 31, | | | % |
| --- | --- | --- | --- | --- |
|  | 2021 | 2020 | $ Change | Change |
| Revenue | $ 14,522 | $   7,488 | $   7,034 | 94% |
| Cost of revenue | $ 18,481 | $   7,848 | $ 10,633 | 135% |
| Operating expenses | $ 57,059 | $ 15,535 | $ 41,524 | 267% |
| Other income (expense) (1) | $   7,110 | $  (3,298) | $ 10,408 | 316% |
| GAAP net loss | $(53,908) | $(19,193) | $(34,715) | (181%) |

66.    On March 1, 2022, Latch filed its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 10-K"), affirming the previously reported financial results. The 2021 10-K was approved and signed by Defendants Schoenfelder, Mitchell, Rishi, Smith, Campbell, Han, Speyer, and Sugrue. Regarding the Company's revenue recognition policy for hardware, the 2021 10-K stated, in relevant part:

*Hardware and Other Related Revenue*

We generate hardware revenue primarily from the sale of our portfolio of devices for our smart access and smart apartment solutions. We sell hardware to building developers directly or through our channel partners who act as the intermediary and installer. We recognize hardware revenue when the hardware is shipped directly to building developers or to our channel partners, which is when control is transferred to the building developer.

We provide warranties that our hardware will be substantially free from defects in materials and workmanship for a period of one year for electronic components and five years for mechanical components. We replace, repair or refund warrantable devices at our sole discretion.

We determined these warranties are not separate performance obligations as they cannot be purchased separately and do not provide a service in addition to an assurance the hardware will function as expected. We record a reserve as a component of cost of hardware revenue based on historical costs of replacement units for returns of defective products. Due to our limited operating history, our ability to forecast future operating results, including the estimation of product returns, may differ materially from actual results. We also provide certain customers a wholesale arrangement with a right of return for non-defective products, which is treated as a reduction of hardware revenue based on our expectations and historical experience.

We also generate revenues related to hardware, which includes professional services related to installation and activation of hardware devices sold to building developers. These services are recognized over time on a percentage of completion basis.

67.    The 2021 10-K also reported Latch's "substantial" remediation progress with respect to previously disclosed material weaknesses in its internal control over financial reporting:

Management identified material weaknesses in our internal control over financial reporting for the periods ended December 31, 2020 and 2019. The material weaknesses relate to: (a) general segregation of duties, including the review and approval of journal entries; (b) lack of a formalized risk assessment process; (c) selection and development of control activities, including over information technology related to certain account balances; and (d) accounting for complex financial instruments (as further described below). Management has concluded that these material weaknesses in internal control over financial reporting were due to the fact that (i) with respect to weaknesses (a), (b) and (c), we were a private company with limited resources and did not have the necessary business processes and related internal controls formally designed and implemented, coupled with the appropriate resources with the appropriate level of experience and technical expertise, to oversee our business processes and controls, and (ii) with respect to

weakness (d), we had limited resources and did not have the appropriate resources, with the appropriate level of experience and technical expertise, to oversee the accounting for complex accounting transactions.

*    *    *

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Report. In making this evaluation, management considered the material weaknesses in our internal controls over financial reporting described above. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures were not effective.

We have implemented substantial remediation efforts as described below. As such, weaknesses (a), (b) and (d) as noted above have been addressed. Remediation efforts are still ongoing for weakness (c) regarding the development and effectiveness of control activities, and we are on target to remediate this material weakness during the year ended December 31, 2022. Remediation efforts to date include the following:

- We strengthened our compliance and accounting functions with additional experienced hires to address evaluation of technical accounting matters, as well as added headcount to address general segregation of duties. System controls have been implemented, tested and determined to be effective pertaining to review and approval of journal entries. As such, management believes that components (a) and (d) of the material weaknesses identified above have been remediated as of December 31, 2021.

- We performed a formalized financial and fraud risk assessment and subsequently selected and designed internal control activities, including over information technology. As such, management believes that component (b) of the material weaknesses identified above has been remediated as of December 31, 2021.

- We performed full-scope testing and assessed the effectiveness of our financial and information technology control activities. While substantial progress was made broadly, further action and additional testing in certain areas is required before we can conclude full remediation.

- We continue to be engaged with external consultants with public company and technical accounting experience to facilitate accurate and timely accounting closes and to accurately prepare and review the financial statements and related footnote disclosures. We plan to retain these financial consultants, as needed, until such time that the required financial controls have been fully implemented.

68.     On April 28, 2022, the Company filed its annual Proxy Statement with the SEC ("2022 Proxy Statement" or "2022 Proxy"). Defendants Schoenfelder, Rishi, Smith, Campbell, Han, Speyer, and Sugrue solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

69.     The 2022 Proxy Statement called for Company shareholders to, *inter alia*: (1) elect defendants Rishi and Smith to the Board; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2021; and (3) approve, on an advisory basis, the compensation paid to the Company's named executive officers in 2021, including defendants Schoenfelder and Mitchell.

70.     With respect to the Board's risk management duties, the 2022 Proxy Statement stated the following:

**Our Board's Role in Risk Oversight**

The Audit Committee is responsible for discussing our policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which Latch's exposure to risk is handled. In accordance with those policies, the Board and its committees have an active role in overseeing management of our risks. The Board regularly reviews information regarding our credit, liquidity, and operations, as well as the risks associated with each. The Compensation Committee is responsible for overseeing the management of risks relating to executive compensation plans and arrangements. The Audit Committee oversees management of financial and cybersecurity risks and potential conflicts of interest. The Nominating and Corporate Governance Committee manages risks associated with the independence of the Board. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks.

We have established a Management Risk Committee, meeting quarterly and reporting regularly to the Audit Committee, to provide additional oversight of our enterprise risk management function. The Management Risk Committee is comprised of our Interim Chief Financial Officer, Chief Technology Officer, Chief Operating Officer, General Counsel, Senior Vice President of People and Director of Internal Audit. The Management Risk Committee is tasked with (i) meeting with senior employees to identify material risks, (ii) categorizing and ranking risks by significance, (iii) working with management to establish and implement remediation plans for top risks, and (v) regularly reporting to the Audit Committee on all of the above. Under the Audit Committee's oversight, management has

also established a formal enterprise risk management charter.

71.     The 2022 Proxy Statement also listed certain responsibilities of the Audit Committee as follows:

- appointing, compensating, retaining, evaluating, terminating, and overseeing our independent registered public accounting firm;

- discussing with our independent registered public accounting firm their independence from management;

- reviewing with our independent registered public accounting firm the scope and results of their audit;

- approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm;

- overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the quarterly and annual financial statements that we file with the SEC;

- overseeing our financial and accounting controls and compliance with legal and regulatory requirements;

- reviewing our policies on risk assessment and risk management;

- reviewing related person transactions; and

- establishing and maintaining procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls, or auditing matters.

\

72.     The 2022 Proxy Statement was materially false and misleading for the reasons set forth herein.  The Board also solicited the 2022 Proxy Statement a few months before the catastrophic August 25, 2022 revelation that it would restate financial statements for 2021 and the first quarter of 2022 due to revenue recognition errors related to the sale of hardware devices.

73.     The 2022 Proxy Statement was false and misleading for the additional reason that it failed to disclose that contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties.

74.     The 2022 Proxy Statement was also false and misleading with regard to executive compensation. Specifically, the 2022 Proxy Statement asserted that the Company "provides incentive compensation with our performance on both a short-term and long-term basis and "align the long-term interests of our NEOs with those of our stockholders" while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein. The Individual Defendants' unwarranted compensation in the face of the Company's lack of internal controls that allowed false and misleading statements to be issued demonstrates that the Company did not in fact maintain a compensation philosophy that rewards performance. As a result, the 2022 Proxy Statement was materially misleading.

75.     The false and misleading elements of the 2022 Proxy Statement were material to shareholders in voting on the Board's proposals in the 2022 Proxy Statement, particularly with respect to shareholders' consideration of the reelection of current directors and the advisory vote regarding the executive compensation.

76.     As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders reelected Defendants Rishi and Smith to the Board, allowing them to continue breaching their fiduciary duties to Latch. Furthermore, the material misstatements and omissions contained in the 2022 Proxy Statement led Company shareholders to approve on an advisory basis the compensation of the Company's named executive officers, including Defendants Schoenfelder and Mitchell.

77.     On May 5, 2022, Latch announced its first quarter 2022 financial results in a press release that stated, in relevant part:

**Key Business Metrics and Select Financial Metrics**

- **Software Revenue**: Software revenue for the three months ended March 31, 2022 was $3.0 million, up 88% compared to $1.6 million for the same period in 2021.

- **Total Revenue**: Total revenue for the three months ended March 31, 2022 was $13.7 million, up 106% compared to $6.6 million for the same period in 2021.

- **ARR**: ARR for the three months ended March 31, 2022 was $7.9 million, up 137% compared to $3.3 million for the same period in 2021.

- **Spaces**: Spaces for the three months ended March 31, 2022 was 126,746, up 129% compared to 55,305 for the same period in 2021.

- **Net Loss**: Net loss for the three months ended March 31, 2022 was $44.2 million, up 16% compared to $38.1 million during the same period in 2021.

- **Adjusted EBITDA**: Adjusted EBITDA for the three months ended March 31, 2022 was $(36.8) million, down 165% compared to $(13.9) million during the same period in 2021. Please see below for a reconciliation of Adjusted EBITDA to our closest GAAP metric, net loss, as well as a discussion of why we view Adjusted EBITDA as an important metric.

78.     The same day, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2022, affirming the previously reported financial results. With respect to its revenue recognition policy, Latch stated, in relevant part:

26

The Company generates hardware revenue primarily from the sale of its portfolio of devices for its smart access and smart apartment solutions. The Company sells hardware to building developers directly or through its channel partners who act as the intermediary and installer. The Company recognizes hardware revenue when the hardware is shipped directly to building developers or to its channel partners, which is when control is transferred to the building developer.

79.    On August 10, 2022, Latch filed a notice of inability to timely file its quarterly report on Form 10-Q for the period ended June 30, 2022 due to an internal investigation into revenue recognition practices. The Company stated, in relevant part:

Latch, Inc. (the "Company") is unable to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2022 (the "Quarterly Report") without unreasonable effort or expense within the prescribed time period. The Audit Committee of the Company's Board of Directors has commenced an investigation (the "Investigation") of alleged current and prior period matters that include, but may not be limited to, certain aspects of the Company's current and historic key performance indicators and revenue recognition practices, including the accounting treatment, financial reporting and internal controls related thereto. As the Investigation includes matters related to accounting for the quarter ended June 30, 2022, the Company is unable to file the Quarterly Report at this time.

Following the completion of the Investigation, the timing of which cannot be estimated, the Company will make a determination regarding whether any revision, correction or restatement of its financial statements for any previous quarter or fiscal year will be made, as well as the timing of filing the Quarterly Report.

80.    The above statements identified in ¶¶60-80 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors: (1) that there were unreported sales arrangements related to hardware devices; (2) that, as a result, the Company had improperly recognized revenue throughout fiscal 2021 and first quarter 2022; (3) that there were material weaknesses in Latch's internal control over financial reporting related to revenue recognition; (4) that, as a result of the foregoing, Latch would restate financial statements for fiscal 2021 and first quarter 2022; and (5) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially

misleading and/or lacked a reasonable basis.

81.    A mere two weeks later, on August 25, 2022, after the market closed, Latch revealed that it would restate financial statements for 2021 and the first quarter of 2022 due to revenue recognition errors related to the sale of hardware devices. Specifically, the Company stated that "certain revenue recognition errors occurred as a result of unreported sales arrangements due to sales activity that was inconsistent with the Company's internal controls and procedures." Specifically, in a Form 8-K filed with the SEC, Latch stated, in relevant part:

> As previously disclosed by Latch, Inc. (the "Company") on August 10, 2022, the Audit Committee of the Company's Board of Directors (the "Audit Committee") has commenced an investigation (the "Investigation") of possible current and prior period matters that include, but may not be limited to, certain aspects of the Company's current and historic key performance indicators and revenue recognition practices, including the accounting treatment, financial reporting and internal controls related thereto.

> While the Investigation is ongoing, on August 19, 2022, based on the preliminary findings of the Investigation, the Audit Committee determined that the Company's consolidated financial statements for 2021 included in the Company's Annual Report on Form 10-K for the year ended December 31, 2021 and associated report of the Company's independent registered public accounting firm, Deloitte & Touche LLP ("Deloitte"), *as well as the Company's consolidated financial statements for the first quarter of 2022 included in the Company's Quarterly Report on Form 10-Q for the three months ended March 31, 2022, should no longer be relied upon as a result of material errors and possible irregularities relating to, among other things, the manner in which the Company recognized revenue associated with the sale of hardware devices during 2021 and the first quarter of 2022.* Accordingly, the Audit Committee, in consultation with the Company's management, has determined that the Company's consolidated financial statements for 2021 and the first quarter of 2022 will be restated.

> Based on the preliminary findings of the Investigation, *certain revenue recognition errors occurred as a result of unreported sales arrangements due to sales activity that was inconsistent with the Company's internal controls and procedures.* The Company's management is assessing the effect of the matters identified to date and the restatement on the Company's internal control over financial reporting and its disclosure controls and procedures. Although the assessment is not yet complete, the review is likely to result in one or more material weaknesses in the Company's internal control over financial reporting during the applicable periods.

> While the Audit Committee believes the errors identified to date affect only the 2021 and first quarter 2022 consolidated financial statements based on the preliminary findings of the Investigation, the Investigation remains ongoing, and it is possible that the Audit Committee, in consultation with the Company's management, will determine that additional errors, including errors that may affect additional periods, could be identified. As a result, the Audit Committee has not determined whether financial statements for any other periods include errors or possible irregularities or the amounts of any required adjustments to the Company's previously reported financial statements for such periods. Following the completion of the Investigation, the Company will file amended periodic reports for any periods requiring restatement.

(Emphasis added).

82.     On this news, Latch's stock fell $0.13, or 12.2%, to close at $0.95 per share on August 26, 2022, on unusually heavy trading volume.

83.     On November 10, 2022, the Company disclosed that the Audit Committee's investigation had been expanded to include a review of the Company's financial statements for 2019 and 2020 and that additional errors were identified with respect to the Company's financial statements for those periods.

84.     On January 23, 2023, the Company filed a Form 8-K with the SEC stating, among other things:

> On January 17, 2023, based on the findings of the Investigation, the Audit Committee, after discussion with management, determined that, in addition to the Company's consolidated financial statements for 2021 and the first quarter of 2022, the consolidated financial statements for 2019 and 2020 (all such interim and annual periods, the "Affected Periods") should no longer be relied upon as a result of internal control deficiencies and errors relating to the manner in which the Company recognized revenue, each as further described below. Accordingly, the Audit Committee, in consultation with the Company's management, has determined that the Company's consolidated financial statements for the Affected Periods will be restated. Any previously issued or filed reports, registration statements, proxy statements, prospectuses, press releases, earnings releases, investor presentations or other communications including, describing or incorporating by reference the Company's consolidated financial statements and other related financial information covering the Affected Periods should no longer be relied upon.

The Investigation is now substantially complete. The Company's management and Audit Committee have initiated the remediation process to address the errors and issues identified by the Investigation, including personnel actions, changes to internal controls and enhancements to accounting resources and training. The recently appointed interim chief executive and chief financial officers are leading the Company's efforts to apply the findings of the Investigation to the remediation and restatement processes.

The errors and issues identified by the Investigation include errors in the recognition of revenue for sales to various customers resulting primarily from (1) a failure of certain sales personnel in certain cases to disclose relevant terms they had negotiated with customers and a failure to identify, consider and properly account for such terms, (2) a failure to consider fully the impact of certain terms of sales agreements with customers in determining the amount and timing of revenue to be recognized and (3) a failure to adequately assess collectability. The Investigation also identified errors in certain key performance indicators, including "bookings" and related metrics. The Company ceased presenting bookings-related metrics in the 2021 Annual Report, and those metrics should no longer be relied upon. The errors and issues occurred at various times throughout the Affected Periods. The description of the errors and issues is solely based on the results of the Investigation conducted to date, and the errors and issues are subject to further analysis as the Company completes the restatement process. The results of the restatement will be subject to audit by the Company's independent registered public accounting firm. The Company plans to file amended annual and quarterly reports, as applicable, for the Affected Periods as soon as reasonably practicable.

The Company expects to conclude that one or more material weaknesses related to the matters described above existed in the Company's internal controls over financial reporting for the Affected Periods and that the Company's controls and procedures for such periods were not effective.

## DAMAGES TO LATCH

85.    As a result of the Individual Defendants' improprieties, Latch disseminated improper, public statements concerning Latch's operations, prospects and internal controls. This misconduct has devastated Latch's credibility.

86.    As a direct and proximate result of the Individual Defendants' actions, Latch has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Actions. Additionally, Latch will incur costs and expenses in

connection with the restatements of its financial statements for 2021 and the first quarter of 2022 and the Audit Committee's internal investigation.

87.     Lastly, the actions of the Individual Defendants have irreparably damaged Latch's corporate image and goodwill. For at least the foreseeable future, Latch will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Latch's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

88.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

89.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

90.     Plaintiff is an owner of Latch common stock and was an owner of Latch common stock at all times relevant hereto.

91.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

92.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Latch Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

93.     At the time of filing this action, the Board consists of Defendants Rishi, Smith, Campbell, Han, Speyer, and Sugrue (the "Director Defendants"). Plaintiff needs only to allege

demand futility as to half of the six directors who are on the Board at the time this action is commenced.

**DEMAND IS FUTILE AS TO RISHI, SMITH, CAMPBELL, HAN, SPEYER, AND SUGRUE BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

94.     Defendants Rishi, Smith, Campbell, Han, Speyer, and Sugrue all face a substantial likelihood of liability for their individual misconduct. Defendants Rishi, Smith, Campbell, Han, Speyer, and Sugrue were directors during the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

95.     Moreover, Defendants Rishi, Smith, Campbell, Han, Speyer, and Sugrue as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company was acting legally and its internal controls regarding revenue recognition were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they reviewed, authorized and/or caused the public statements, presentations, public statements and publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

96.     Defendants Rishi, Smith, Campbell, Han, Speyer, and Sugrue knowingly and consciously allowing the public statements and SEC filings on behalf of the Company, the authorization of false and misleading failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls regarding revenue recognition were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being

discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Defendants Rishi, Smith, Campbell, Han, Speyer, and Sugrue face a substantial likelihood of liability. If Defendants Rishi, Smith, Campbell, Han, Speyer, and Sugrue were to bring a suit on behalf of Latch to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to Defendants Rishi, Smith, Campbell, Han, Speyer, and Sugrue.

**DEFENDANTS SPEYER, CAMPBELL, HAN, RISHI, CAMPBELL, AND SUGRUE ARE NOT DISINTERESTED**

97.     Defendant Speyer, Campbell, Han, Rishi, Campbell, and Sugrue  are incapable of considering a demand to commence and vigorously prosecute this action because they face additional substantial likelihood of liability as they are named defendants in the Securities Class Actions.

**DEMAND IS EXCUSED AS TO DEFENDANTS CAMPBELL, RISHI, AND SMITH BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

98.     Defendants Campbell, Rishi, and Smith as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the public statements, presentations, the filing of false financial statements and allowing the Company to repeatedly make other false and misleading statements to the investing public. More specifically, as members of the Audit Committee, Defendants Campbell, Rishi, and Smith were obligated to review the Company's annual and quarterly reports to ensure their accuracy and to ensure that the Company's internal controls were performing adequately. Instead, Defendants Campbell, Rishi, and Smith as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal controls over its revenue recognition and other financial information provided by the Company, as required by the Audit

Committee Charter. Indeed, as admitted by the Company, the Company operated with inadequate internal controls. For this reason, demand is futile as to Defendants Campbell, Rishi, and Smith.

<u>**COUNT I**</u>
**BREACH OF FIDUCIARY DUTY AGAINST THE INDIVIDUAL DEFENDANTS**

99.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

100.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Latch's business and affairs.

101.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

102.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Latch.

103.    In breach of their fiduciary duties owed to Latch, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact (1) that there were unreported sales arrangements related to hardware devices; (2) that, as a result, the Company had improperly recognized revenue throughout fiscal 2021 and first quarter 2022; (3) that there were material weaknesses in Latch's internal control over financial reporting related to revenue recognition; (4) that, as a result of the foregoing, Latch would restate financial statements for fiscal 2021 and first quarter 2022; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

104.    The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

105.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Latch has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company

106.    Plaintiff, on behalf of Latch, has no adequate remedy at law.

## COUNT II

### AGAINST DEFENDANTS SCHOENFELDER, RISHI, SMITH, CAMPBELL, HAN, SPEYER, AND SUGRUE FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT

107.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

108.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

109.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

110.     Under the direction and watch of the Defendants Schoenfelder, Rishi, Smith, Campbell, Han, Speyer, and Sugrue, the 2022 Proxy Statement failed to disclose, *inter alia,* contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties.

111.     The 2022 Proxy Statement was also false and misleading with regard to executive compensation. Specifically, the 2022 Proxy Statement asserted that the Company "provides incentive compensation with our performance on both a short-term and long-term basis and "align the long-term interests of our NEOs with those of our stockholders" while failing to disclose that the Company's share price was artificially inflated as a result of the false and misleading statements alleged herein. In fact, while the Board sought shareholder approval of executive compensation, the Company's executives were issuing materially false and misleading statements that concealed the true state of Latch's operations and future business prospects.

112.     The 2022 Proxy Statement further failed to disclose that: (1) that there were unreported sales arrangements related to hardware devices; (2) that, as a result, the Company had improperly recognized revenue throughout fiscal 2021 and first quarter 2022; (3) that there were material weaknesses in Latch's internal control over financial reporting related to revenue recognition; (4) that, as a result of the foregoing, Latch would restate financial statements for fiscal 2021 and first quarter 2022; and (5) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. As a result, the 2022 Proxy Statement was materially false and misleading.

113.   In the exercise of reasonable care, Defendants Schoenfelder, Rishi, Smith, Campbell, Han, Speyer, and Sugrue should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to: (1) the reelection of Defendants Douglas, McGlynn, and Mott; (2) the approval, on an advisory basis, of the compensation of the Company's executives; (3) the amendment and restatement of the 2015 Stock Plan; (4) the ratification of equity awards issued in April 2020 and June 2020; and (5) the ratification of the appointment of the Company's independent auditor.

114.   The false and misleading elements of the 2022 Proxy Statement led to, among other things, Company shareholders reelecting Defendants Rishi and Smith to the Board and allowing them to continue breaching their fiduciary duties to Latch. Furthermore, the material misstatements and omissions contained in the 2022 Proxy Statement led Company shareholders to approve on an advisory basis the compensation of the Company's named executive officers, including Defendants including defendants Schoenfelder and Mitchell.

115.   The Company was damaged as a result of the Defendants Schoenfelder, Rishi, Smith, Campbell, Han, Speyer, and Sugrue's material misrepresentations and omissions in the 2022 Proxy Statement.

116.   Plaintiff, on behalf of Latch have no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of Latch, and that Plaintiff is an adequate representative of the Company;

B.      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Latch;

C.      Determining and awarding to Latch the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.      Directing Latch and the Individual Defendants to take all necessary actions to reform and improve Latch's corporate governance and internal procedures to comply with applicable laws and to protect Latch and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.      a provision to permit the shareholders of Latch to nominate at least four candidates for election to the Board;

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.  Awarding Latch restitution from Individual Defendants, and each of them; and

F.  Awarding Plaintiff the costs and disbursements of this action, including reasonable

   attorneys' and experts' fees, costs, and expenses; and Granting such other and further

   relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: New York, New York
       February 15, 2023

                                     Respectfully submitted,

                                     **THE SHAPIRO FIRM, LLP**

                                     By: /s/ *Robert J. Shapiro*
                                          Robert J. Shapiro
                                          Jonathan S. Shapiro
                                     270 Madison Avenue, Suite 1801
                                     New York, NY 10016
                                     Email: rshapiro@theshapirofirm.com
                                            jshapiro@theshapirofirm.com
                                     Tel. (212) 391-6464
                                     Fax. (212) 719-1616

                                     *Local Counsel for Plaintiff*

                                     **HYNES & HERNANDEZ, LLC***
                                     Michael J. Hynes
                                     Ligaya T. Hernandez
                                     101 Lindenwood Drive, Suite 225
                                     Malvern, PA 19355
                                     Email: mhynes@hh-lawfirm.com
                                            lhernandez@hh-lawfirm.com
                                     Tel. (484) 875-3116
                                     Fax. (914) 752-3041

                                     *Counsel for Plaintiff*
                                     *(\*Pro-Hac Vice Motion to be Filed)*